## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEVIN YOUNG, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-01-1551-M |
| | ) | |
| MIKE MULLIN, Warden, Oklahoma | ) | |
| State Penitentiary, | ) | |
| | ) | |
| Respondent. | ) | |

## M E M O R A N D U M   O P I N I O N

Petitioner, a state prisoner currently facing execution of a sentence of death, appears with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his convictions in the District Court of Oklahoma County. Respondent has responded to Petitioner's *Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By a Person in State Custody* (hereinafter "Petition").[1] The state court record has been supplied[2] and Petitioner has replied.

### A.   History of the Case

<u>Procedural History</u>

Petitioner was convicted by a jury in the District Court of Oklahoma County, State of Oklahoma (Case No. CF-96-2963) of Murder in the First Degree (Count I), Attempted Robbery with Firearms (Count II) and Shooting with Intent to Kill (Count III). The jury fixed punishment at

---

[1] References to the parties' pleadings shall be as follows: Petitioner's *Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By a Person in State Custody* shall be cited as (Pet. at __.); Respondent's *Response to Petition for Writ of Habeas Corpus* (hereinafter "Response") shall be cited as (Resp. at __.); Petitioner's *Reply* (hereinafter "Reply") shall be cited as (Reply at __.).

[2] The trial court's original record shall be cited as (O.R. at __.). The trial transcript shall be cited as (Tr., Vol. __, p. __.). References to the evidentiary hearing shall be cited as (E.H., Vol. __, p. __.).

twenty years imprisonment on Count II and thirty years imprisonment on Count III.  After finding the existence of three aggravating circumstances, the jury made a recommendation of a sentence of death.[3]  The trial court followed the jury's recommendation and sentenced Petitioner to death.

Petitioner appealed his conviction and his sentence of death to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  That court affirmed Petitioner's conviction and death sentence in a published opinion.  See Young v. State, 12 P.3d 20 (Okla. Crim. App. 2000).  Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished order dated October 31, 2000. See Young v. State, PCD-2000-123 (Okla. Crim. App. 2000).

On May 24, 2002, Petitioner filed his Petition with this Court, asserting ten grounds for habeas relief and further requesting an evidentiary hearing.  Respondent filed his Response on August 30, 2002, and Petitioner filed his Reply on October 15, 2002.

Factual History

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).  For the purposes of consideration of the present Petition, this Court provides and relies upon the following synopsis from the OCCA's published opinion, summarizing the evidence presented at Petitioner's trial.  Following a thorough review of the record, trial transcripts and the admitted

---

[3] The jury found the existence of the following three aggravating circumstances: (1) previous conviction of a felony involving the threat or use of violence; (2) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (3) that Petitioner's actions created a great risk of death to more than one person.

exhibits, this Court finds this summary by the state court is adequate and accurate.  The Court therefore adopts the following summary as its own.

This case arose from a shooting during an attempted robbery at the Charles Steak House in Oklahoma City in the early morning hours of May 14, 1996, where Joseph Sutton ran a gambling operation in a back room.  Sometime after midnight on May 14, 1996, two African-American men, armed with guns, entered the Charles Steak House, and walked into the gaming room.

Karl Robinson testified the taller man said "[a]ll you SOBs are going to die." George Edwards heard the same man say he was going to kill everyone.  When Edwards saw the taller man pull a gun, Edwards grabbed the gun and held it in the air while the taller man fired it repeatedly until the gun was emptied.  At this same time, the shorter of the two men pulled his gun, pointed it in the air and said "[w]e come for the money."  Joseph Sutton threw something on the floor, pulled his own gun, pointed it at the shorter man and tried to fire it, but a bullet was not chambered and the gun did not fire.  The shorter man then fired on Sutton.

Sutton was shot four times and died as a result of a gunshot wound to his abdomen.  Quintin Battle, who was in between Sutton and the shorter gunman, was shot twice during the gunfire.  Battle testified he dropped to the floor when the shooting began, because he feared he would be shot and killed.  George Edwards suffered powder burns on his arms and face while struggling with the taller gunman.

Both gunmen ran from the Charles Steak House after the shooting.  One ran down North Lottie, away from the restaurant, holding his arm.

Within minutes of the shooting, Appellant arrived at Presbyterian Hospital emergency room with three gunshot wounds.  He told emergency personnel his name was "Roy Brown."  He had a bullet in his left chest, another bullet wound to his right thigh, and a third grazing wound to his right shoulder.  Hospital personnel reported the gunshot victim to the police.

Officer Cook, who was responding to the Charles Steak House shooting, heard dispatch report a gunshot victim at Presbyterian Hospital.  He went to the hospital and asked "Roy Brown" if he was at the Charles Steak House.  Appellant told officer Cook he had not been there and said he was shot near a 7-11 convenience store and an Autozone store.  Appellant told officer Cook he rode a bus to the hospital and did not know where he was shot because he was from out of state. Officer Cook testified he knew Metro Transit buses did not operate after midnight and he suspected "Roy Brown" had in fact been involved in the Charles Steak House shooting.  He contacted officers at the shooting scene and asked if any witnesses there could identify the shooter.

Appellant also spoke with Officer Smith at the hospital and gave him a different date of birth than he gave officer Cook. He told officer Smith he was shot near a 7-11 convenience store and an Autozone store, but said he did not know how he got to the hospital.

Within thirty (30) minutes of the shooting, Karl Robinson and Ben Griffin were brought separately to the hospital to see if they could identify the person in the emergency room. Karl Robinson saw Appellant lying on a gurney. Robinson was unsure whether Appellant was one of the gunmen until he saw Appellant's shirt on the floor. He told the officers the shirt looked the same. Robinson was unable to identify Appellant at the preliminary hearing, but positively identified Appellant at trial.

Ben Griffin thought Appellant was one of the shooters and asked to see the shirt he was wearing. After he saw the shirt, he too affirmatively identified Appellant as one of the shooters. Griffin could not identify Appellant at preliminary hearing and did not try to identify him at trial.

No weapons were recovered at the scene of the shooting. However, a .38 caliber Smith and Wesson revolver containing six spent shell casings was found in a trash can about two blocks from Presbyterian Hospital. The woman who found the gun heard someone drop it in her curbside garbage can around 12:30 a.m. on May 14, 1996. The deceased's Sphinx .380 semiautomatic pistol was given to police officers by the owner of the restaurant a couple of days after the shooting. The owner obtained the gun from the restaurant manager who had hidden the gun and taken the deceased's wallet and money from his pockets immediately after the shooting. Police officers also recovered a .9mm handgun and $500.00 from a van belonging to Ben Griffin.

Ballistics and firearms testing were done on the recovered weapons, projectiles and casings found at the scene and recovered from the deceased. Four full metal jacket bullets recovered from the shooting scene were .380 caliber and were determined to have been fired from the deceased's gun. Eight .380 caliber auto fired casings were found to be consistent with having been fired from the deceased's gun. Two lead projectiles found at the scene had insufficient markings for ballistics comparison. Two copper jacket projectiles could not have been fired from any gun recovered. One projectile found at the scene was consistent with having been fired from the .38 caliber Smith and Wesson revolver that was found in the trash can. Two bullets recovered from the deceased were consistent with having been fired from the .38 caliber Smith and Wesson revolver. All six casings found in the .38 caliber Smith and Wesson were positively identified as having been fired from that gun.

Blood samples were collected from the shooting scene and were also taken from the deceased Joseph Sutton, Quintin Battle, the codefendant Antwuan Jackson,

4

and from Appellant. Of three blood swabbings collected from the scene, one positively matched the deceased's blood sample, another did not match any known sample, and the third positively matched Appellant's blood sample. DNA testing confirmed a positive match of the blood sample collected from the shooting scene with Appellant's blood sample. Two DNA forensic chemists testified to the positive match, and one estimated the combined probability results of a match would occur in the African-American population only one in one hundred thirty-two million times (1:132,000,000).

Young, 12 P.3d at 27-31(footnotes omitted).

**B.      Standard of Review.**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrow the circumstances under which federal habeas corpus relief is available.

An application of a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)&(2). The AEDPA further provides that a factual determination made by a state court shall be presumed correct absent a petitioner's rebuttal through clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The United States Supreme Court defined the AEDPA's applicable standard of review for federal habeas courts reviewing state court decisions:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - - the state-court

> adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also LaFevers v. Ward, 182 F.3d 705, 711 (10th Cir. 1999). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . , a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." Walker v. Gibson, 228 F.3d 1217, 1225 (10th Cir. 2000), cert. denied, 533 U.S. 933, 121 S. Ct. 2560 (2001)(abrogated on other grounds by Neill v. Gibson, 278 F.3d 1044 (10th Cir. 2001) (quoting Williams, 529 U.S. at 410-11); see also Brown v. Payton, __ U.S. __, 125 S.Ct. 1432 (2005). This Court will review the Petition under the principles outlined in Williams. See, e.g., Romano v. Gibson, 239 F.3d 1156, 1163-64 (10th Cir.), cert. denied, 534 U.S. 1046 (2001); Hale v. Gibson, 227 F.3d 1298, 1309-10 (10th Cir. 2000), cert. denied, 533 U.S. 957, 121 S. Ct. 2608 (2001); Thomas v. Gibson, 218 F.3d 1213, 1219-20 (10th Cir. 2000).

**C.    Grounds for Relief.**

Ground 1:    Sufficiency of the Evidence to Prove Malice Aforethought Murder.

In his first ground for relief, Petitioner claims the state presented no evidence that he killed anyone or assisted in a killing. Respondent contends that review of the record reveals sufficient

evidence was presented to support Petitioner's conviction for first degree malice-aforethought

murder and his conviction for shooting with intent to kill.  Respondent further contends the OCCA's

determination was neither contrary to nor an unreasonable application of Supreme Court law, nor

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

On direct appeal, the OCCA delineated the applicable law for review on appeal of

sufficiency of the evidence claims and set forth the trial court's instructions on the elements and

definitions of first degree murder with malice aforethought.  The OCCA determined:

> The evidence, viewed in a light most favorable to the State, shows Appellant
> entered the restaurant, armed with a gun, with the intent to commit armed robbery,
> and demanded money.  His action in firing his weapon at least four times directly at
> Joseph Sutton support the jury's conclusion that he acted with malice aforethought.
> Appellant also claims the evidence was insufficient to show identity, based
> upon his belief that the identification testimony was not reliable and did not
> conclusively show Appellant committed the shooting.  However, we have already
> determined the identification testimony was properly admitted.  The jury properly
> considered the evidence presented, was appropriately instructed on the use of
> eye-witness identification testimony, and concluded the State's evidence was
> sufficient to show Appellant committed the offense.
> "Although there may be conflict in the testimony, if there is competent
> evidence to support the jury's finding, this Court will not disturb the verdict on
> appeal." Cheney v. State, 1995 OK CR 72, ¶ 44, 909 P.2d 74, 86, quoting Woodruff
> v. State, 1993 OK CR 7, ¶ 30, 846 P.2d 1124, 1134, cert. denied, 510 U.S. 934, 114
> S.Ct. 349, 126 L.Ed.2d 313 (1993).  Review of the entire record reveals sufficient
> evidence supported the jury's conclusions that Appellant killed Sutton and did so
> with malice aforethought.  We find no merit in this proposition.

Young, 12 P.3d at 35.

In a federal habeas proceeding, the appropriate inquiry into a sufficiency-of-the-evidence

claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The inquiry is based upon the entire record

and the reasoning process actually used by the trier of fact, whether known or not, is not considered. Id. at 319 n. 13, 99 S.Ct. 2781 ("The question of whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached.").

The AEDPA additionally directs that, where the state court has already addressed the claim, this Court's review is further limited. See Valdez v. Ward, 219 F.3d 1222, 1237 (10th Cir. 2000). In that instance, the Court's review is governed by 28 U.S.C. § 2254(d).[4]   In its review and determination, the OCCA cited state case law rather than Jackson, but correctly stated and applied the Jackson standard for a sufficiency of the evidence review.[5]

In considering the reasonableness of the OCCA's determination and application of the Jackson standard for sufficiency of the evidence, this Court must compare Oklahoma law regarding the substantive elements of the offense to the testimony and evidence presented at trial to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

The trial court gave to the jury the following instructions based on Oklahoma law:

INSTRUCTION NUMBER 8

No person may be convicted of Murder in the First Degree unless his conduct

---

[4]   The Tenth Circuit's authority is divided as to whether, under the AEDPA, review of a sufficiency-of-the-evidence issue is a legal determination under 28 U.S.C. § 2254(d)(1) or a factual finding under § 2254(d)(2) and (e)(1). See, e.g., Moore v. Gibson, 195 F.3d 1152, 1176-77 (10th Cir. 1999)(summarizing split in case law); Mayes v. Gibson, 210 F.3d 1284, 1293 (10th Cir.). In this instance, there is no need to determine which standard is appropriate as the result would be the same under either AEDPA section. See, e.g., Gilbert v. Mullin, 302 F.3d 1166, 1181 (10th Cir. 2002); Hooker v. Mullin, 293 F.3d 1232, 1239 n. 6 (10th Cir. 2002).

[5]   The OCCA cited and applied the standard set forth in Spuehler v. State, 709 P.2d 202, 203-04 (Okla. Crim. App. 1985).  In Spuehler, the OCCA has adopted the Jackson standard for assessing the sufficiency of the evidence. The OCCA's determination will, therefore, be considered as an application of Jackson. See Torres v. Mullin, 317 F.3d 1145, 1152 (10th Cir. 2003).

or the conduct of another person for which he is criminally responsible caused the death of the person allegedly killed.  A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life.

(O.R. at 769)

### INSTRUCTION NUMBER 9

No person may be convicted of Murder in the First Degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

| | |
|---|---|
| First, | the death of a human; |
| Second, | the death was unlawful; |
| Third, | the death was caused by the defendant; |
| Fourth, | the death was caused with malice aforethought. |

(O.R. at 770)

### INSTRUCTION NUMBER 10

"Malice aforethought" means a deliberate intention to take away the life of a human being.  As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will.  The deliberate intent to take a life must be formed before the act and must exist at the time a homicidal act is committed.  No particular length of time is required for formation of this deliberate intent.  The intent may have been formed instantly before commission of the act.

(O.R. at 771)

### INSTRUCTION NUMBER 11

The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life.  External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

(O.R. at 772)[6]

In the instant case, the jury heard testimony that two men entered the game room of the

---

[6]  The trial court also instructed the jury on knowingly and with criminal intent aiding and abetting another in the commission of a crime as making that person a principal to the crime. (O.R. at 782-84.)

restaurant where the victim was killed - one of the men shorter than the other.  The shorter man walked over and positioned himself on the west side of the room by the bathroom and in the immediate vicinity of the victim.  The taller man positioned himself on the east side of the room. One of the witnesses testified he saw the shorter man pull a revolver out from his clothes and told everyone that they were there for the money and to not move.  As the witness fell to the floor, he heard shooting start in the area by the bathroom where the victim and the shorter man were located.[7] A short time later, Petitioner presented himself to the emergency room with gun shot wounds.[8]  He was later identified as one of the men with guns at the steakhouse.  Blood was found at the crime scene determined to have a high statistical probability of a DNA match to Petitioner's blood.

Petitioner's reliance on Sanders/Miller v. Logan, 710 F.2d 645 (10th Cir. 1983), is factually misplaced.  In Sanders, a pre-AEDPA case, the petitioner was entitled to relief because the evidence only supported the conclusion that she had aided and abetted a robbery.  There was no evidence in the record the petitioner had known the robber had a gun on the night of the robbery or had owned a gun.  There was also evidence the petitioner had expressed shock when she learned the robber had shot the victim and that she had to be calmed before fleeing.  Id. at 653-54.

In Torres v. Mullin, 317 F.3d 1145 (10th Cir. 2003), the petitioner argued the evidence at trial was insufficient to establish the requisite intent necessary under Oklahoma law to satisfy the elements of first degree malice murder and of aiding and abetting.  The petitioner argued, as does Petitioner here, that no witness could testify to any action by him that resulted in the death of the

---

[7]  The witness testified that the shorter man and the victim "started shooting at each other." (Tr., Vol. III, p. 715.)

[8]  There is no indication in the record that the taller man received any wounds as a result of the gunfire.

victims - either as the perpetrator or as an aider and abettor.  He further argued the prosecutor offered no evidence that he shared the intent to kill the victims or aided an accomplice in the murders.  The Tenth Circuit recapitulated the facts set forth by the OCCA regarding witness testimony: the defendants being seen together prior to the killings; both men were arrested together shortly after the killings; the petitioner had blood on his clothing at the time of his arrest; the petitioner was armed with a weapon and entered the residence through a door that had been kicked down; and, the victims were shot repeatedly.  The Tenth Circuit determined that although the evidence was susceptible to interpretation, a review of the record suggested a rational trier of fact could certainly conclude that Torres had the requisite intent to kill and that the OCCA's application of Jackson was not objectively unreasonable.  Id. at 1155-56.

Here, eyewitnesses identified Petitioner as the "shorter man".  The taller man was heard to say that everyone was going to die shortly before the shorter man pulled his gun, pointed it into the air and said that they had come for the money.  Witnesses also heard gunshots from where the shorter man was standing.  Upon review of the entire record, the Court cannot conclude the OCCA's determination was objectively unreasonable.  See Bell v. Cone, 535 U.S. 685 (2002); Williams v. Taylor, 529 U.S. 362, 412 (2002).  The evidence, in a light most favorable to the prosecution, supports a determination that any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.  Accordingly, Petitioner's first ground for relief is denied.

Ground 2:      Failure to Instruct on Lesser Included Offenses.

In his second ground for relief, Petitioner claims the trial court erred in failing to instruct the jury on lesser included offenses of murder in the second degree (depraved mind murder) and first degree manslaughter (heat of passion manslaughter).  Respondent responds that the evidence did not support lesser included offense instructions and that the OCCA's determination was not contrary

to, or an unreasonable application of, Supreme Court precedent, nor was its determination an unreasonable application of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(1) and (2).

Under Beck v. Alabama, 447 U.S. 625 (1980), "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." Id. at 627. "Due process thus requires that a state court give a lesser included offense instruction if the evidence would support a conviction on that offense." Darks v. Mullin, 327 F.3d 1001, 1009 (10th Cir. 2003), citing Hopper v. Evans, 456 U.S. 605, 609 (1982) (citing Beck ). "Under Beck, a petitioner is required to establish not only the denial of a lesser included offense instruction, but also that he presented sufficient evidence to warrant such an instruction." Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999)(citing Beck, 447 U.S. at 637.)

The question under Beck, however, is not whether there was sufficient evidence to support the first degree murder conviction, but rather, whether there was sufficient evidence to warrant a jury instruction on the lesser included offense. Id. at 1305-06. To succeed on his claims that the trial court's failure to instruct the jury on the lesser included offenses violated Beck, Petitioner must demonstrate the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder. See Hogan at 1307 (citing Hopper, 456 U.S. at 610.).


A.  Second Degree Murder - Depraved Mind.

On appeal, the OCCA referred to and applied both Supreme Court and state law regarding

the standards dictating the necessity to give lesser included offense instructions.  In reference to

Petitioner's claim of an improperly refused second-degree murder instruction, the OCCA stated:

> At trial, Young's defense was that he was shot somewhere else and had no
> connection with the Charles Steak House shootings.  Appellant offered no alibi
> witness, and other witnesses testified no report was made in those early morning
> hours of any shooting near a 7-11 convenience store and Autozone store.  Despite
> the manner in which the case was defended, Appellant requested instructions on first
> degree heat-of-passion manslaughter, first degree manslaughter by resisting criminal
> attempt, second degree depraved mind murder and second degree felony murder, and
> the trial court denied the requested instructions.
>
> * * *
>
> Similarly, we find Appellant was also not entitled to instructions on second
> degree depraved mind murder.  While we would concede Appellant's imminently
> dangerous conduct caused the death of Joe Sutton, we simply cannot interpret the
> evidence to show he committed such conduct without a particularized intent.  "A
> design to effect death [i.e., premeditation] is inferred from the fact of killing, unless
> the circumstances raise a reasonable doubt whether such design existed. 21
> O.S.1991, § 702.  Premeditation sufficient to constitute murder may be formed in an
> instant." Patton, 1998 OK CR 66, ¶ 36, 973 P.2d at 286; Boyd, 1992 OK CR 40, ¶
> 11, 839 P.2d at 1367.  Malice aforethought may be proved by circumstantial
> evidence. Cavazos v. State, 1989 OK CR 53, ¶ 11, 779 P.2d 987, 989.
>
> Appellant entered the business with the intent to rob its occupants with the
> use of a deadly weapon.  He stood directly in front of Joe Sutton, raised his weapon,
> and demanded money.  He fired upon Sutton when Sutton tried unsuccessfully to
> defend himself.  The physical evidence showed the gunshot wound that killed Sutton
> entered through the right side of the back of his chest.  Malice can be inferred from
> these facts and the evidence did not require an instruction on depraved mind second
> degree murder.

Young, 12 P.3d at 38-40.

Second degree "depraved mind" murder is defined as a homicide "perpetrated by an act

imminently dangerous to another person and evincing a depraved mind, regardless of human life,

although without any premeditated design to effect the death of any particular individual." Title 21

O.S. § 701.8(1).  Petitioner's requested jury instruction, refused by the trial court, stated:

MURDER IN THE SECOND DEGREE BY IMMINENTLY DANGEROUS CONDUCT

ELEMENTS

13

No person may be convicted of murder in the second degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

| | |
|---|---|
| First, | the death of a human; |
| Second, | caused by conduct which was imminently dangerous to **another/other** person(s); |
| Third, | the conduct was that of the **defendant(s)**; |
| Fourth, | the conduct evinced a depraved mind in extreme disregard of human life; |
| Fifth, | the conduct is not done with the intention of taking the life of or harming any particular individual. |

You are further instructed that a person evinces a "depraved mind" when he engages in imminently dangerous conduct with contemptuous and reckless disregard of, and in total indifference to, the life and safety of another.

You are further instructed that "imminently dangerous conduct" means conduct that creates what a reasonable person would realize as an immediate and extremely high degree of risk of death to another person.
CR 4-91

(O.R. at 881)(emphasis original).

Petitioner claims the OCCA's determination can be interpreted in one of two ways.  He states the first interpretation is that the state court acknowledged the evidence was sufficient for the lesser included offense, but declined to require the instruction because there was sufficient evidence of the greater offense, contrary to the holdings of <u>Beck</u> and <u>Hogan</u>.  A review of the OCCA's reasoning eliminates this interpretation.  The court clearly stated the evidence could not be interpreted to show he committed such conduct "<u>without</u> a particularized intent." <u>Young</u>, 12 P.3d at 39 (underlining added).  The absence of any premeditated design to effect death of any particular individual is an element of the offense of second degree "depraved mind" murder.  Petitioner's requested jury instructions require not only an absence of intent of taking the life of a particular individual, but also an absence of intent of *harming* any particular individual.

Although a closely related analysis exists between the two offenses, the OCCA's determination was not a sufficiency of the evidence determination of the greater offense as Petitioner

contends. Petitioner has failed to demonstrate the evidence presented at trial would permit a rational jury to find an absence of a particularized intent to harm or take the life of the victim.[9] See Hogan, 197 F.3d at 1307.

Petitioner's second asserted interpretation is that the state court believed there was indisputable evidence Petitioner shot the victim and did so with the premeditated intent to kill. Petitioner contends that if this interpretation is correct, the state court's determination of fact and law was unreasonable, as the record is "devoid of any evidence" he fired a gun or aimed it at anyone, and that the only basis for such a conclusion is circumstantial.

Petitioner has not demonstrated the OCCA's decision was an unreasonable determination of facts in light of the evidence presented in state court. Witnesses identified Petitioner as the shorter of the two men with guns in the steak house. They also testified to hearing him demand money and hearing gunshots from where he was standing. These facts, although circumstantial, are sufficient when taken together with the forensic and ballistics evidence presented at trial to support the OCCA's determination. Upon review of the entire record, this Court cannot find the OCCA's determination to be unreasonable.

### B.  First Degree Manslaughter - Heat of Passion.

Petitioner also claims he was entitled to an instruction on first-degree manslaughter because the victim pulled out a gun and pointed it directly at him, and the instruction is warranted when a homicide follows and attack with a dangerous weapon. Respondent responds that Petitioner was not entitled to the instruction because the victim's attack was not unprovoked. Respondent adds that the evidence did not support an inference the murder was committed without a design to effect death

---

[9] Petitioner continues to alternatively assert the state failed to prove he was the individual who shot the victim. This claim has been previously addressed in Ground One, *supra*, and will be further discussed briefly below.

as required by the first-degree murder statute.  On appeal, the OCCA determined:

> Appellant claims sufficient evidence was presented to support instructions on first degree heat-of-passion manslaughter, because it showed he fired on Sutton out of fear after Sutton "drew and fired, or at least attempted to fire."  Appellant argues his shooting of Sutton was triggered by his fear and therefore supported an instruction on heat-of-passion manslaughter.  He claims an instruction on manslaughter by resisting criminal attempt was also warranted by the evidence showing he shot Sutton to keep Sutton from shooting him.
>
> We disagree with Appellant's description of the evidence.  By all accounts, Appellant and his co-intruder instigated the whole incident when they entered the Charles Steak House with the intent to commit robbery; they were armed, made threats, and demanded money.  Things went amiss when Appellant's intended robbery victim tried to thwart the robbery and defend himself with his own weapon.  Sutton's weapon, however, did not fire and Appellant fired at him.  The medical examiner testified the four gunshot wounds to Sutton's body were in a right to left and downward trajectory, and the gunshot wound which caused Sutton's death entered the back of his chest.  The medical examiner also testified the exit wound of the number two bullet demonstrated Sutton's body was up against something hard which kept it from exiting.  The physical evidence suggests Appellant continued to shoot Sutton after he had fallen to the ground.
>
> While we agree that a passion arising from fear may reduce a homicide from murder to manslaughter, the cases cited by Appellant are distinguishable.  In Hayes v. State, 1981 OK CR 96, ¶ 2, 633 P.2d 751, 752, the appellant testified he was afraid when the victim came at him with a knife and that he shot the man in self-defense.  On appeal, the court found the instruction on manslaughter was properly given.  Id.  In Wood v. State, 1971 OK CR 232, ¶¶ 2-4, 486 P.2d 750, 751-752, the defendant, while trying to defend himself, hit a man with a board during a street brawl.  There, in modifying the conviction from murder to manslaughter, the Court noted absence of proof of premeditation or intentional design where there was no "proof the defendant had a motive, sought out the deceased, or even knew him." Id., 1971 OK CR 232, ¶ 14, 486 P.2d at 753.  Here, the circumstances surrounding the shooting clearly show Appellant and his cohort planned and instigated the entire deadly situation.  Further, the evidence suggests Appellant shot Sutton while Sutton was on the ground.  He was not entitled to instructions on a reduced degree of homicide simply because an intended victim chose to defend himself.

Young, 12 P.3d at 39.


In Oklahoma, first-degree "heat of passion" manslaughter is defined as:

Homicide is manslaughter in the first degree in the following cases:

* * *

2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

Okla. Stat. tit. 21 § 711(2).

Petitioner's reliance on Hogan v. Gibson, 197 F.3d 1297 (10th Cir. 1999) is misplaced. Petitioner asserts that an instruction on first-degree heat-of-passion manslaughter is required merely when the homicide follows an attack with a dangerous weapon. (Pet. at 21.) Hogan, however, recognizes that Oklahoma law requires the victim's attack to be unprovoked. Id. at 1308-09. The OCCA determined that Petitioner and his cohort planned and instigated the situation which led to the victim choosing to attempt to defend himself. In other words, the OCCA determined the victim's actions, or "attack" as Petitioner argues, was provoked. The OCCA also determined the physical evidence supported a reasonable conclusion of premeditation or intentional design. Petitioner has not demonstrated the OCCA's determination that he was not entitled to lesser included offense instructions to be unreasonable. Accordingly, Petitioner's second ground for relief is denied.

Grounds 3 and 4:      Ineffective Assistance of Counsel

In his third ground for relief, Petitioner claims trial and appellate counsel were ineffective for failing to present available evidence to discredit the prosecutor's contention that Petitioner fired the fatal shots. In his fourth ground for relief, Petitioner claims his trial counsel was ineffective for failing to investigate and utilize mitigating evidence of Petitioner's difficult upbringing.

Applicable Standard

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must first show that his counsel "committed serious errors in light of 'prevailing professional norms'" in that the representation fell below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688 (1984). In so doing, Petitioner must overcome the

"strong presumption" that his counsel's conduct fell within the "wide range of reasonable professional assistance" that "'might be considered sound trial strategy,'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955).  He must, in other words, overcome the presumption that his counsels' conduct was constitutionally effective.  United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993).  A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir.), cert. denied, 513 U.S. 1009 (1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'"  Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987), quoting Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those errors not occurred."  Haddock, 12 F.3d at 955; citing Strickland, 466 U.S. at 688, 694; Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).  In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied, 507 U.S. 929 (1993).  Petitioner carries the burden of establishing both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense.  Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993); Sallahdin v. Mullin, 380 F.3d 1242, 1248 (10th Cir. 2004).  In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just

result." <u>Strickland</u>, 466 U.S. at 686.[10]

The proper standard for assessing appellate ineffectiveness of counsel is also the standard set forth in <u>Strickland</u>.  <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1202 (10th Cir. 2003).  The OCCA, on Post Conviction, relied on <u>Walker v. State</u>, 933 P.2d 327, 332, to establish that the claim of ineffective assistance of appellate counsel was barred because it was based on facts which were not unavailable at the time of Petitioner's direct appeal.  <u>Young</u>, PCD-2000-123, op. at 2-5, 7-9.  The Tenth Circuit has held that the standard used in <u>Walker</u> did not comport with federal law.  <u>Cargle v. Mullin</u>, 317 F.3d at 1205.

> The proper standard for assessing a claim of ineffectiveness of appellate counsel is that set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000)(following <u>Smith v. Murray</u>, 477 U.S. 527, 535-36 (1986)).  Thus, the petitioner must show both (1) constitutionally deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding - in this case the appeal - would have been different.  <u>Id.</u> at 285 (applying <u>Strickland</u>).

<u>Id.</u> at 1202.  Because the OCCA used the incorrect  legal standard to decide this issue, review of this claim is not constrained by the deference principles in § 2254(d).  <u>Id.</u> at 1202, 1205; <u>Revilla v. Gibson</u>, 283 F.3d 1203, 1220 (10th Cir. 2002); <u>Sallahdin v. Gibson</u>, 275 F.3d 1211, 1234-35 (10th Cir. 2002); <u>Romano v. Gibson</u>, 239 F.3d 1156, 1179 (10th Cir. 2001).  Accordingly, this Court will review Petitioner's claim of ineffective assistance of appellate counsel *de novo*. <u>See  Fisher v. Gibson</u>, 282 F.3d 1283, 1290 (10th Cir. 2002).

_____

[10]  "[I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d)." <u>Strickland</u>, 466 U.S. at 698, <u>quoted in</u> <u>Bolender v. Singletary</u>, 16 F.3d 1547, 1558 n. 12 (11th Cir.), <u>cert. denied</u>, 513 U.S. 1022 (1994); <u>United States v. Miller</u>, 907 F.2d 994, 997 (10th Cir. 1990); <u>quoting</u> <u>Wycoff v. Nix</u>, 869 F.2d 1111, 1117 (8th Cir.), <u>cert. denied</u>, 493 U.S. 863, 110 S.Ct. 179 (1989).  The state court's findings of historical fact, however, are entitled to the presumption of correctness.  <u>Miller</u>, 907 F.2d at 997; <u>Bolender</u>, 16 F.3d at 1558 n. 12.

"When a habeas petitioner alleges that his counsel was ineffective for failing to raise an issue on appeal, we examine the merits of the omitted issue(s) in relation to the issues counsel did raise. Cargle, 317 F.3d at 1202; Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner's issue does not have to be a "dead bang winner" to prevail on an appellate ineffectiveness claim, but instead must show a reasonable probability the omitted claim would have resulted in a reversal on appeal. Neill, 278 F.3d at 1057 n.5. Failure to raise an issue that is without merit, "does not constitute constitutionally ineffective assistance of counsel, . . . because the Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal." Banks v. Reynolds, 54 F..3d 1508, 1515 (10th Cir. 1995). There can be no ineffective assistance of appellate counsel if the underlying grounds fail. Jones v. Gibson, 206 F.3d 946, 959 (10th Cir. 2000).

Ground 3 - Ineffective Assistance in First Stage of Trial.

Petitioner claims trial and appellate counsel were ineffective for failing to present available evidence in the form of a crime scene reconstruction expert to discredit the prosecutor's contention that Petitioner fired the fatal shots. Petitioner raised this claim for the first time on post-conviction review:

> In Proposition One, Petitioner contends he was denied his Sixth Amendment right to counsel, and his appellate counsel was ineffective, because appellate counsel failed to investigate and challenge trial counsel's failure to utilize an expert in crime scene reconstruction in preparation of Petitioner's defense in both the first and second stages of trial.

> In judging claims of ineffective assistance of appellate counsel, this Court utilizes the three-prong test set forth in Walker v. State, 1997 OK CR 3, ¶ 11, 993 P.2d at 333. The threshold inquiry under this test is whether appellate counsel actually committed the act which gives rise to the ineffective assistance allegation. If petitioner can establish appellate counsel actually committed the act alleged to be ineffective, then this Court determines whether the performance of appellate counsel was deficient under the first prong of the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct.2052, 2064, 80 L.Ed.2d 674 (1984). If petitioner meets the second burden, then this Court will consider the mishandled

substantive claim, asking whether the deficient performance supports a conclusion "either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." Walker, 1997 OK CR 3, ¶ 11 & n. 25, 933 P.2d at 333, n. 25, quoting 22 O.S. Supp. § 1089(C)(2).

Using this analysis, Proposition One fails. Examination of the records, transcripts and briefs filed in Petitioner's direct appeal shows that his direct appeal counsel did not raise a claim challenging trial counsel's failure to retain the services of a crime scene reconstructionist. Therefore, the first threshold question of Walker is met.

Turning to the second requirement, we must determine whether such performance was deficient under the first prong of the Strickland test. 22 O.S. Supp. 1995, § 1089(C)(2); Walker, 1997 OK CR 3, ¶ 11, 965 P.2d 985, 990. We disagree with Petitioner's assertion that appellate counsel's failure to raise such a claim amounted to deficient performance and rose to the level of structural error, and also find it unnecessary to grant Petitioner's request for an evidentiary hearing on the basis of this claim.

At trial, an eye-witness to the shooting identified Petitioner as the "shorter" and another witness identified the "shorter" man as the person who shot and killed Joseph Sutton. On direct appeal, Petitioner challenged the identification testimony and we determined that the testimony was properly admitted and that the ultimate decision of the reliability of the eye-witness testimony properly rested in the hands of the jury. Even though post-conviction counsel maintains the crime scene reconstructionist could have assisted the jury in analyzing the crime scene evidence, we are not persuaded that appellate counsel's failure to argue trial counsel was ineffective for not utilizing such an expert's services amounted to an unreasonable performance under prevailing professional norms.

DNA evidence presented at trial showed conclusively that Petitioner was present at the crime scene. This evidence, coupled with the witness' accounts of what happened, was readily understandable. While post-conviction counsel obtained what might have been relevant information through the use of the forensic crime scene analyst, the fact that such an expert was or would have been available to trial counsel does not mean appellate counsel was ineffective for not attacking trial counsel's decision not to utilize such an analyst. In fact, the argument presented is not that use of such an expert would have proved Petitioner's innocence or changed the outcome of the trial, but rather that such testimony would have shown the crime scene investigation was not perfect and could have been better. The fact that the initial investigation of the crime scene made it "difficult to arrive at conclusions concerning who may have shot whom and from what positions" does not mean that utilizing the testimony of an expert at trial would have somehow made the evidence any clearer. As Young cannot show his appellate counsel's performance was deficient, he cannot meet the second threshold question and this proposition of error

is denied.

<u>Young v. State</u>, *Opinion Denying Application for Post-Conviction Relief and Motion for Evidentiary Hearing*, PCD 2000-123, pp. 2-5 (Oct. 31, 2000).

An evidentiary hearing was held in this Court on May 3 and 4, 2004.  In support of this contention, Petitioner presented Ed Hueske, an expert in crime scene reconstruction.  Mr. Hueske was first contacted by post-conviction counsel to review certain documents and attempt to reconstruct the shooting. (E.H., Vol. I, p. 88-89.)  He did not observe from his review of the photographs any clear evidence of bullet holes in the ceiling in the area of the "taller man" (E.H., Vol. I, pp. 91, 93), indicating to him that there was no physical evidence to support the idea that someone emptied a gun straight into the ceiling as asserted by the prosecution. (E.H., Vol. I, p. 93.)  Mr. Hueske was critical of the investigation done at the scene.   Due to the limited physical information gathered during the investigation, he testified the best he could do was to look at the different descriptions of the bullets, try to look for a general pattern and then develop some suggested scenarios. (E.H., Vol. I, p. 94.)  His opinions and suggested scenarios are based on assumptions the bullet fragments were in the original location following the shooting, and had not been moved. (E.H., Vol. I, p. 97.)[11]  In his opinion, the bullets that struck and killed the victim came from the location of the taller man and not the shorter man. (E.H., Vol. I, p. 97.)  Had he been contacted at the time

of Petitioner's trial, he would have been available to consult and do the remainder of the work in the

---

[11]   He was, however, aware that the scene was potentially disturbed by witnesses and emergency medical personnel prior to the arrival of the police and investigators. (E.H., Vol. I, p. 114-116.)

crime scene reconstruction. (E.H., Vol. I, p. 101.)

On cross-examination, Mr. Hueske agreed the State did not present a crime scene reconstruction expert at trial and instead relied upon eyewitness testimony to form the basis for its case. (E.H., Vol. I, p. 102.)  It was his testimony that crime scene investigation in this case was such that a true reconstruction wasn't an option. (E.H., Vol. I, p. 103.)  The evidence he reviewed did not conclusively prove who fired the fatal shot. (E.H., Vol. I, p. 111.)  Mr. Hueske agreed the photo of the gun found near the hospital where Petitioner was being treated appeared consistent with a Smith and Wesson .38 caliber short-barreled pistol and that witnesses had described the gun used by the tall man as "shiney" with a long barrel. (E.H., Vol. I, p. 105.)  He acknowledged that the firearms examiner at trial found that the fatal bullet was generally characteristically consistent with the .38 pistol recovered near the hospital, but added that many weapons could have similar class characteristics. (E.H., Vol. I, p. 113.)  Mr. Hueske agreed the wounds to the victim were more consistent with a person standing and firing at a downward angle, than by an individual such as the taller man, reported by witnesses to have been wrestling on the floor with a 300 pound man.  Based on the available evidence, Mr. Hueske could not conclusively eliminate Petitioner as the individual who fired the fatal shot and agreed that in this case reliance would have to be placed in the eyewitness testimony. (E.H., Vol. I, pp. 114, 120.)

On re-direct, Mr. Hueske stated that in 1997-98, due to the absence of documentation of bullet holes in the ceiling, he would have had no difficulty telling Petitioner's lawyer or the jury that the crime scene was totally inconsistent with the prosecutions's theory the shorter man shot and killed the victim because the taller man's shots went into the ceiling. (E.H., Vol. I, p. 123.)

Petitioner states that during post-conviction an expert found that the fatal shots were likely

fired from the gun of the taller man and that both trial and appellate counsel recognized, upon being

confronted with the expert's report, that the information from Mr. Hueske could have been valuable

in defending Mr. Young. (Pet. at 23) In support of this allegation, Petitioner relies on the affidavit

of trial counsel Barry Albert, prepared during post-conviction prior to Mr. Albert's death. (Appendix

II of Petition.) Mr. Albert's affidavit does not, however, agree with Petitioner's assertions:

> 3.     The facts of this case clearly could not justify [a] first degree murder charge, at most it was a homicide.  The defense was that the victim was the first aggressor and that was established at trial.
>
> * * *
>
> 5.     Until I read the report made by Edward E. Hueske I did not appreciate that Gordon Robertson's investigation and reports were critically insufficient and that his investigation was incomplete and inconclusive.  The prosecutor's theory of the crime was not supported by the incomplete forensic evidence gathered at the crime scene.  I could never get it through to the jury this contention and what it meant.  My efforts were not good enough to substantiate what the expert has been able to show in his analysis.  The expert was able to more clearly delineate the positions of the parties - a report of this sort would have helped the jurors understand *the victim was the aggressor and Kevin was acting in self-defense*.  The jury never understood the position of the parties and how the shooting took place and without understanding that they presumed the prosecutor, Fern Smith's theory was correct.

(Affidavit of Barry Albert, June 16, 2000, Appendix II of Petition.)(emphasis added)

Petitioner has not demonstrated that trial counsel's failure to call a crime scene

reconstruction expert amounted to deficient performance.  The State did not present an expert on

crime scene reconstruction at trial, but instead relied on eyewitness testimony and accounts of how

the murder occurred.  Eyewitness testimony, together with DNA evidence, placed Petitioner at the

crime scene and witnesses identified Petitioner as the "shorter man" who fired the fatal shots.  Even

were counsel's failure to call a crime scene reconstruction expert considered deficient performance,

however, Petitioner has not demonstrated prejudice - a "reasonable probability" the outcome would

24

have been different.  "To surmount the strong presumption of reasonable professional assistance, a criminal defendant bears the burden of proving, by a preponderance of the evidence, that his trial counsel acted unreasonably." Sallahdin v. Mullin, 380 F.3d 1242, 1248 (10th Cir. 2004)(citations omitted).  The evidentiary hearing demonstrated that although some questions existed as to the quality of the initial crime scene investigation, a crime scene reconstruction expert at trial would not have demonstrated Petitioner's innocence or changed the outcome of the trial.  Petitioner has failed to demonstrate trial counsel was ineffective in failing to present a crime-scene reconstructionist to contest the prosecution's contentions.  Because trial counsel was not ineffective, appellate counsel was not ineffective in failing to challenge trial counsel's effectiveness.  Jones v. Gibson, 206 F.3d 946, 959 (10th Cir. 2000).

Ground 4 - Second Stage Ineffective Assistance.

Petitioner next contends that counsel's failure to present mitigation evidence regarding his troubled childhood was the result of counsel's failure to investigate and his failure to utilize available expert testimony regarding the devastating impact of growing up in gang infested South Central Los Angeles.  Petitioner adds that trial counsel's failure to discover and present mitigating evidence that

the spokesperson for the victim's family did not favor the death penalty was also ineffective assistance.

Petitioner raised this claim on direct appeal.  The OCCA did not find trial counsel to be ineffective and denied the claim:

> Young argues trial counsel was ineffective for failing to present mitigating evidence, and specifically for failing to seek out and present available evidence

25

relating to the social impact on the physical, mental, emotional, and moral development of children raised in inner-city ghettos. Young attempts to support this claim by referring to extra-record material filed in support of his Motion for Evidentiary Hearing on Sixth Amendment Claims.

* * *

In support of his application, Appellant offered the affidavits of two investigators, an affidavit and Curriculum Vitae from James H. Johnson, Jr., Ph.D., and an essay or paper authored by Dr. Johnson. One investigator's affidavit focuses on Appellant's family and social history. The other investigator's affidavit suggests several jurors felt there was little information about Appellant's past and they did not perceive any remorse on Appellant's part. Dr. Johnson's essay focused on the criminal behavior of young African American males raised in the inner city, specifically Los Angeles, California, and emphasized the need to evaluate that behavior based upon the broader family, community and social contexts.

Review of the application and the supporting affidavits shows trial counsel could well have utilized this evidence and it may have been prudent for him to do so. However, Appellant has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify this evidence. The jurors were in fact presented with evidence concerning Appellant's social background and family history through the testimony of his sister, although the evidence was not presented in the same context it would have been if presented by the learned Dr. Johnson. We do not believe the extra-record material establishes by clear and convincing evidence that trial counsel was ineffective for not presenting this mitigation evidence through Dr. Johnson. Accordingly, this proposition of error and Appellant's Motion for Evidentiary Hearing on Sixth Amendment Claims are denied.

Young, 12 P.3d at 44-45.

At the second stage of trial, Petitioner's counsel presented three witnesses: Frederick Smith (Oklahoma County detention officer and record custodian); Dr. Phillip Murphy and Linda McZeal (Petitioner's sister). Mr. Smith testified that for the two years Petitioner had been in county jail awaiting trial, his file and record were "clean" of any violations and/or disciplinary reports. (Tr. Trans., Vol. IX, pp. 1685-88.)

Dr. Murphy, a licensed clinical psychologist, was engaged by the defense to perform an evaluation of Petitioner. After administering seven separate tests and conducting a clinical

interview, it was Dr. Murphy's opinion that Petitioner was competent to stand trial, had normal to above average intellect, had no psychiatric disorders and was an easygoing, well-dispositioned individual. He also found Petitioner to not be particularly violent and opined that Petitioner would not be a dangerous person or a danger to society in a structured prison environment.[12]

Linda McZeal testified as a representative of Petitioner's family. She told how Petitioner was the youngest of sixteen children and that their mother died when Petitioner was about one year old. Petitioner's grandmother moved into the home and took care of the children until her death approximately three to four years later. Afterwards, Ms. McZeal took some of the children to live with her, and her sister, Renee McZeal, took the other children, including Petitioner. He lived with his sister until he was in the fifth grade, when he requested to live with Linda McZeal and her children. Petitioner thereafter lived with her until his adulthood. She described Petitioner as a "no-problem child" who achieved good grades in school and who was active on the high school football team. She described the area where they lived as a prominent neighborhood and the school as a "very, very good school." She admitted that Petitioner got into trouble after high school and eventually was sent to prison. She described him as different and estranged after being in prison. She suspected her brother of being involved in a gang after his release. She added some family history regarding their oldest brother being "gunned down" in his home. (Tr. Trans., Vol. IX, pp. 1713-25.)

At the evidentiary hearing, Petitioner presented a different childhood background through testimony of several family members, including additional testimony from Linda McZeal. Although

---

[12] Although the trial court sustained trial counsel's objection, the court did not admonish the jury to disregard the prosecutor's inquiry of Dr. Murphy regarding whether he was aware at the time he administered the tests and interviewed Petitioner that Petitioner was a gang member. (Tr. Trans., Vol. IX, pp. 1701-04.)

there were various discrepancies of the description of Petitioner as a child and of the neighborhoods in which he lived, several constant themes were revealed through the family.  After the death of his grandmother, Petitioner's aunt moved into the home to take care of the younger children.  Several of the family members testified the aunt was mean to the children, abusive and was eventually arrested for striking Petitioner's brother in the head with a skate.  It was at this time Petitioner began living with his sister Renee McZeal.  Renee McZeal testified that during the time Petitioner lived with her there were weapons, stolen goods and drugs which had been brought into the house by her husband.  Later, Petitioner moved constantly while living with Linda McZeal.  Ms. McZeal's boyfriends during that time were drug dealers.  While he was growing up, Petitioner kept in contact with the old neighborhood and made regular visits there with his sisters and his cousins.  During the 1970's and 1980's, violence in the old neighborhood was commonplace.  Gunshots were heard every day and homicides were so common that there was often no report of them in the newspapers.  Both Petitioner and his family members knew many people who were either killed or went to prison.  In addition, several of Petitioner's family members were either murdered, had been shot, or had been incarcerated.  (See Evidentiary Hearing deposition transcripts of: Renee McZeal (Exhibit 30); Karen McZeal (Exhibit 31); Ronald McZeal (Exhibit 32); Linda McZeal (Exhibit 33); Kenneth McZeal (Exhibit 34); Antoine McZeal (Exhibit 35); and, Shanae McZeal (Exhibit 36)).

Petitioner also presented Dr. James H. Johnson, a professor and expert in urban geography and urban sociology, to testify on the impact of the south central Los Angeles' gangland environment and of a dysfunctional family on a young black male such as Petitioner.[13]  Dr. Johnson testified Petitioner's community environment at the time he was growing up had a "devastating set

---

[13]  Dr. Johnson did not personally speak with any of Petitioner's family members or with Petitioner in preparing his opinion. (E.H., Vol. I, pp. 58-59.)

of forces operating" on young black men, including substantial economic downturn, loss of resources from the government and social institutions, and entrenchment of gang cultures. He opined that Petitioner could not reasonably have succeeded without sustained access to persons and institutions outside his negative environment, and that Petitioner's negative environment was amplified by his negative personal and family circumstances. Dr. Johnson stated that an expert in this area could have informed the jury of the extent Petitioner was the product of this south central Los Angeles gangland culture and the product of a dysfunctional family whose finances were tied to illegal activities. In his opinion, young black men growing up in south central Los Angeles should not face the death penalty when they commit violent murders. Their violent acts are not the fault of the young men, but rather the result of their exposure to violence and their lack of access to mainstream institutions and role models during their childhood. Dr. Johnson stated that when he has assisted in explaining these influences in other cases across the country, that juries have rejected the death penalty in all but approximately five of the forty cases in which he has testified. (E.H., Vol. I, pp. 21-86.)

John Floyd worked for the Oklahoma County Public Defender's office as a mitigation investigator at the time of Petitioner's trial, and eventually became involved in Petitioner's case on direct appeal. In his review of the investigation done in preparation of trial, he became aware of a psychological evaluation of Petitioner and some interviews with a few family members, but was not aware of any additional mitigation investigation or preparation. He did not consider the mitigation evidence he observed in the file to be significant. Although he and Barry Albert did not have the best professional relationship, he was aware of Mr. Albert's trial experience, good reputation in the legal community and numerous awards for excellence in advocacy. From his review of the file, he

agreed it was possible another investigator may have had some involvement in Petitioner's case. As Mr. Floyd was not involved, he could not state what occurred regarding mitigation evidence or what particular tasks were performed.   Although Mr. Floyd met with Petitioner to prepare an affidavit for direct appeal, he did not interview any of Petitioner's family members. (E.H., Vol. I, pp. 126-48.)

Vincent Antonioli was employed with the public defender's office and assisted Mr. Albert in Petitioner's trial.   He did not become involved in the defense of Petitioner until very shortly before the trial.   Mr. Antonioli met Petitioner's sister the day before she testified and presented her as a witness at the second stage of trial.   He could not recall, however, the full extent of their conversation.[14]   He was not aware of any mitigation investigation done prior to the time he became involved in the case.   Without his notes, he was not able to testify whether there was or was not any mitigation investigation performed.   Mr. Antonioli agreed that because Mr. Albert is deceased, he did not know what occurred regarding mitigation prior to his involvement in the case.   He also agreed that Mr. Albert was absolutely qualified to try a capital murder case, that he was well respected by many attorneys in Oklahoma County, and that he had won several awards for his advocacy - including the Clarence Darrow Award.   He could not recall any conflicts between Mr. Albert and Petitioner in the approximately two weeks of trial.   A note in the trial file, written by Mr. Albert, indicated Petitioner had stated he did not want family members to testify at his trial.   This file notation was dated approximately one month after Petitioner's witness list was filed which

---

[14] Mr. Antonioli testified he reviewed the files pertaining to this case and that none of his or Barry Albert's notes were in the files or in the possession of the public defender's office.   It was his practice at the time to take extensive notes, both of interviews with witnesses and during trial. There was also no file regarding mitigation evidence contained in the Public Defender's office file. (E.H., Vol. I, pp. 152-53.)   Neither party has ever had access to trial counsels' notes. (E.H., Vol. I, pp. 157-58, 171-72.)

included several family members as witnesses.  Mr. Antonioli agreed it could have been possible it was Mr. Albert's strategy to avoid unfavorable aspects in Petitioner's background such as gang involvement, but he did not have an independent recollection of Mr. Albert displaying that strategy in his presence.  He also had no recollection asking Mr. Albert about his trial strategy, or what his response would have been had he asked. (E.H., Vol. I, pp. 149-81.)

The state presented Mr. Phillip Anderson, an attorney previously employed as an assistant district attorney in Oklahoma County and one of the prosecutors in Petitioner's trial.  He testified initially about Mr. Albert's stellar reputation in the legal community as a prosecutor and as a criminal defense attorney.  During Petitioner's case, he had no reason to believe Mr. Albert did not perform at that same standard.  Part of the State's attempt during the second stage of trial to prove Petitioner was a continuing threat to society was to introduce Petitioner's gang activity.  The prosecution was unable to introduce this testimony, however, due to Mr. Albert's objections.[15]  In Mr. Anderson's opinion, testimony from family members that Petitioner voluntarily returned to his old neighborhood to engage in gang activity would have been favorable to the State to demonstrate that Petitioner made a conscious choice to remain involved with gangs.  In his opinion, based on participation in the trial, Mr. Albert was trying to establish Petitioner as a non-violent person in the prison system and attempting to keep out any prior history of violence. (E.H., Vol. II, pp.231-58.)

Dr. Phillip Murphy is a licensed clinical psychologist who performed a psychological evaluation on Petitioner prior to trial.  Dr. Murphy testified about a telephone conversation he had with Mr. Albert where counsel informed him of Petitioner's decision to not have family members

---

[15] Mr. Anderson expanded on his statement by explaining that the state attempted to also get the gang activity information in through Petitioner's expert psychologist.  Mr. Albert objected and requested a mistrial.  The judge determined the information would be more prejudicial than probative and refused to allow the state to address gang activity. (E.H., Vol. II, p. 234.)

present during the second stage of trial.  Mr. Albert inquired of Dr. Murphy whether this decision

would change any psychiatric or psychological diagnosis.  It was Dr. Murphy's opinion at the time

that the decision would not change his diagnosis, and that the psychological profile he conducted

did not reveal any suicidal tendencies. (E.H., Vol. II, pp. 258-61.)

Petitioner argues trial counsel was ineffective by failing to investigate and present this aspect

of his childhood and family background.

> "[S]trategic choices made after thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and strategic choices made after less
> than complete investigation are reasonable precisely to the extent that reasonable
> professional judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a reasonable
> decision that makes particular investigations unnecessary.  In any ineffectiveness
> case, a particular decision not to investigate must be directly assessed for
> reasonableness in all the circumstances, applying a heavy measure of deference to
> counsel's judgments."

Wiggins v. Smith, 539 U.S. 510, 521-22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003), citing

Strickland, supra at 690-91.

In determining whether Petitioner's counsel exercised "reasonable professional judgment,"

the principle concern is not whether counsel should have presented a mitigation case.  Wiggins, 539

U.S. at 523, citing Strickland at 691.  Instead, "we focus on whether the investigation supporting

counsel's decision not to introduce mitigating evidence of [Petitioner]'s background was *itself*

*reasonable*."  Wiggins at 523, citing Strickland at 691.  In the instant case, the OCCA considered

affidavits and allegations substantially similar to the evidence and testimony presented in the

evidentiary hearing.  Although the OCCA considered it possibly prudent for trial counsel to have

utilized this evidence, it found when denying this proposition and the motion for an evidentiary

hearing that the extra record material had not shown by clear and convincing evidence a strong

possibility that defense counsel was ineffective for failing to utilize or identify this evidence.[16]

Unfortunately, Mr Albert passed away subsequent to Petitioner's trial, and the Court and parties are left without the benefit of Mr. Albert's testimony to explain his actions or inactions, thoughts and trial strategies during trial.  The evidence the court has been presented does, however, give some insight into what information Mr. Albert possessed.  Evidence has been presented to demonstrate Mr. Albert did speak with some members of Petitioner's family.  He obviously ascertained either through those conversations or through conversations with his client that Petitioner had been involved with gangs prior to coming to Oklahoma.  This is demonstrated through pre-trial motions seeking to exclude any reference by the prosecution of gang activity, as well as Mr. Albert's in-trial objections and arguments.  Further, evidence and testimony was presented at the evidentiary hearing that Petitioner did not want his family members to testify or be present at his trial.  As Petitioner has demonstrated in the evidentiary hearing, the majority of their testimony pertains not only to his childhood, but also to his involvement with gangs - including his involvement even after he had moved to another part of town in an apparently better environment.

In Sallahdin v. Mullin, 380 F.3d 1242 (10th Cir. 2004), the Tenth Circuit remanded Petitioner's claim of ineffective assistance of counsel for an evidentiary hearing on whether trial counsel's performance was deficient for failing to present mitigation evidence of the effects of Petitioner's steroid use on his behavior at the time of the crime.  At the evidentiary hearing, Petitioner's trial counsel "walked the line" between admitting that not calling the expert as a witness was a strategic decision and admitting it was the result of his negligence. Id. at 1245.  The Tenth Circuit stated:

---

[16] The OCCA's use of a clear and convincing standard is in reference to Rule 3.11B(3)(b)(I) for evidentiary hearings.

To prevail on the first prong of the <u>Strickland</u> test, a criminal defendant such as Sallahdin bears the burden of establishing that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Review of counsel's performance under this prong is "highly deferential." <u>Id.</u> at 689, 104 S.Ct. 2052. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id.</u> (internal quotations omitted); <u>see</u> <u>Yarborough v. Gentry</u>, 540 U.S. 1, 124 S.Ct. 1, 5, 157 L.Ed.2d 1 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."); <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)("Counsel's competence . . . is presumed."); <u>Strickland</u>, 466 U.S. at 690, 104 S.Ct. 2052 (stating "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). To surmount the strong presumption of reasonable professional assistance, a criminal defendant bears the burden of proving, by a preponderance of the evidence, that his trial counsel acted unreasonably. <u>See</u> <u>Kimmelman</u>, 477 U.S. at 384, 106 S.Ct. 2574; <u>Alcala v. Woodford</u>, 334 F.3d 862, 869 (9th Cir. 2003); <u>Putman v. Head</u>, 268 F.3d 1223, 1243 (11th Cir. 2001); <u>Cody v. United States</u>, 249 F.3d 47, 52 (1st Cir. 2001); <u>see also</u> <u>Strickland</u>, 466 U.S. at 688, 104 S.Ct. 2052 (holding, without reference to any specific evidentiary standard, that a criminal defendant "must show that counsel's representation fell below an objective standard of reasonableness"); Wayne R. LaFave et al., <u>Criminal Procedure</u> § 11.10(c) at 715 (West 2d 1999) (noting <u>Strickland</u> "places upon the defendant the burden of showing that counsel's action or inaction was not based on a valid strategic choice").

<u>Id.</u> at 1247-48.

Here, as in <u>Sallahdin</u>, Petitioner has failed to surmount the strong presumption of reasonable professional assistance. As with any trial, counsel can always be second-guessed when reviewing his assistance in retrospect. The Court must, however, review trial counsel's actions from his perspective at the time and not predicate its decision on the distorting effects of hindsight. As discussed above, counsel was aware of Petitioner's background to the extent that he chose to limit part of it from introduction into evidence. This decision could have been based on his years of experience coupled with a concern over witness's credibility and a potential bias by a jury against

gang participation. Petitioner has not demonstrated this to be unsound trial strategy amounting to deficient performance. Further, Petitioner has not met his burden of proving that the failure to include all of his background and history was prejudicial - that is, whether the sentencer would have concluded that the balance of the aggravating and mitigating circumstances would not have warranted death. Petitioner has not shown counsel's actions so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.

Petitioner next summarily argues trial counsel was ineffective for failing to discover and present mitigating evidence that the spokesperson for the victim's family did not favor death as a penalty. The OCCA considered and denied this claim on post-conviction review. See Young v. State, No. PCD-2000-123, Opinion Denying Application for Post-Conviction Relief and Motion for Evidentiary Hearing at 7-8 (Okla. Crim. App. Oct. 31, 2000). In a related claim in Petitioner's tenth ground for relief, supra, Petitioner argues it was error for the trial court to not re-open the trial to allow testimony from the victim's family's representative expressing her opinion of the appropriate sentence. Although the OCCA considered such testimony to be admissible, it denied the claim on other grounds. The Supreme Court has expressly prohibited testimony regarding an appropriate sentence. As such, Petitioner cannot demonstrate on habeas review that counsel was ineffective by failing to elicit this testimony, or that the OCCA's determination was contrary to Supreme Court precedent. Accordingly, Petitioner's claims contained in his Third and Fourth Grounds for Relief are denied.


Ground 5:      Eyewitness Identification of Petitioner.

In his fifth ground for relief, Petitioner claims a witness' in-court identification of Petitioner

arose from an improper "one person show-up" identification procedure, was unreliable and should have been suppressed.   The OCCA determined there was no error in allowing the in-court identification and that, even if error, the error was harmless:

> In Proposition One, Appellant complains that the suggestive pretrial identification procedure tainted the subsequent identification of Appellant at trial in violation of his federal and state constitutional rights.   The only witness who identified Appellant at trial was Karl Robinson.   Appellant argues Robinson's in-court identification was tainted and improperly bolstered by the unnecessary one person show-up procedure utilized by the police at the hospital. [17]

> As an initial matter, we do not believe the "one man show-up" at the hospital shortly after the shooting was unduly suggestive or improper.   The record does not demonstrate that either witness was told the person at the hospital was in fact a suspect or one of the shooters.   Furthermore, it was entirely appropriate for the officers to try to discover whether "Roy Brown" was involved in the shooting to determine whether he should be further detained.   "An on the scene confrontation between the victim and the suspect shortly after the commission of the crime may be justified where prompt identification is necessary to determine whether the suspect is the offender or whether police officers should continue their search." Harrolle v. State, 1988 OK CR 223, ¶ 7, 763 P.2d 126, 128.   In some circumstances, an identification through a "one man show-up" near the time of the alleged criminal act tends to insure accuracy rather than bring about misidentification. Id., see also Plunkett v. State, 1986 OK CR 77, ¶ 8, 719 P.2d 834, 838-839, cert. denied, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986).

> Even if we were to find the "show up" was unduly suggestive and encouraged misidentification, the same would not automatically invalidate the subsequent in-court identification if that identification can be established as independently reliable under the totality of the circumstances. Berry v. State, 1992 OK CR 41, ¶ 13, 834 P.2d 1002, 1005.   This Court uses a test that includes consideration of all the surrounding circumstances plus the following:

>> 1) prior opportunity of the witness to observe the defendant during the alleged criminal act;
>> 2) degree of attention of the witness;
>> 3) accuracy of the witness' prior identification;
>> 4) the witness' level of certainty; and,

---

[17]   "Prior to trial, counsel filed a Motion to Suppress Extrajudicial Identification and supporting brief.   The matter was argued and denied on January 9, 1998.   Counsel made contemporaneous objections at trial." Young, 12 P.3d at 34 (footnote 12 in original).

5) the time between the crime and the confrontation.
Id., see also Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401
(1972); Stiles v. State, 1992 OK CR 23, ¶ 41, 829 P.2d 984, 993, cert. dismissed, 516
U.S. 1167, 116 S.Ct. 1257, 134 L.Ed.2d 206 (1996).

Robinson testified at trial that while he was talking to his wife on the
telephone, he saw two men walk into the Charles Steak House and knew they were
not "regulars." He heard a patron yell to keep an eye on those guys. Because he did
not know the men, he got off the phone and focused his attention on the men as they
walked down the ramp into the gaming room. Robinson was able to describe the
skin color, height, and clothing of both men. He also heard the taller man say "All
of you SOBs are going to die" as the taller man pulled out his gun. At that point,
Robinson ran into the kitchen to escape the gunfire. Within minutes of the shooting,
Robinson saw Appellant at the hospital and told officers he recognized the shirt.
Although Robinson was unable to identify Appellant at the preliminary hearing, he,
as well as other witnesses, testified at trial that Appellant's appearance had changed
since the preliminary hearing.

Under these circumstances, Appellant has not shown merely by Robinson's
inability to identify him at the preliminary hearing that his in-court identification at
trial was unreliable. Robinson's testimony at trial was certain and reflected his
degree of attention towards the gunmen was concentrated. We find his in-court
identification was not so tainted and unreliable as to have been inadmissible.
Additionally, circumstantial evidence and DNA evidence connected Appellant to the
crime. Therefore, even if there was error in allowing the in-court identification, we
find the error was harmless beyond a reasonable doubt. 20 O.S.1991, § 3001.1.

Young, 12 P.3d at 33-34.

The OCCA's factual determination is entitled to its presumption of correctness. 28 U.S.C.
§ 2254(e)(1). Petitioner has demonstrated anything other than under the "totality of the
circumstances the identification was reliable." Neil v. Biggers, 409 U.S. 188, 199 (1972). See also
Manson v. Brathwaite, 432 U.S. 98, 114 (1977)("reliability is the linchpin in determining the
admissibility of identification testimony").

In further support of the reliability of the witness' identification, the transcript demonstrates
Petitioner's counsel objected during the trial to the in-court identification and renewed his motion
to suppress. (Tr. Tran., Vol. III, pp. 570-79.) He also cross-examined Mr. Robinson to determine

37

the accuracy and reliability of his testimony regarding both his in-court and out-of-court identification of Petitioner (Tr. Tran., Vol. III, pp. 586-657.)

> Surely, we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." Id., at 384, 88 S.Ct., at 971. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Manson v. Brathwaite, 432 U.S. 98, 116 (1977).

Petitioner's argument that the identification was prejudicial because it was the "only direct evidence that he was at the steakhouse" is unavailing. As Petitioner states two sentences later, there was also DNA evidence that he was in the steakhouse at the time of the homicide. Petitioner has failed to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) and (2). Petitioner's fifth ground for relief is, therefore, denied.

Ground 6:    Failure to Give Self-Defense Instruction.

In his sixth ground for relief, Petitioner claims it was error for the trial court to refuse to give self-defense instructions. Petitioner argues that appellate counsel and the OCCA improperly analyzed the claims assuming that Petitioner was a trespasser. Petitioner contends that he was in the steak house legally and did not, therefore, have an obligation to retreat. He claims that this failure to issue self-defense instructions was a failure to require the state to prove all elements and was a failure to give Petitioner the benefit of basic provisions of state law, constituting a due process violation.

The OCCA denied Petitioner's claim on direct appeal based on insufficient evidence to

demonstrate that Petitioner was a trespasser in retreat:

> Appellant also argues the trial court erred when it refused Appellant's requested
> instructions on self-defense, because the defense is available to trespassers in retreat.
> We find Appellant's claim unpersuasive as the evidence does not show either
> Appellant or his codefendant were trespassers in retreat.  The two gunmen entered
> the Charles Steak House, armed, with the intent to commit robbery.  When the
> victims attempted to thwart the robbery, Appellant and his co-intruder opened fire.
> Under these facts, the evidence did not require instructions on self-defense.  Le, 1997
> OK CR 55, ¶ 23, 947 P.2d at 547; see also Nance v. State, 1992 OK CR 54, ¶ 9, 838
> P.2d 513, 515 (instructions on theory of defense should be given if the evidence
> produced at trial supports the defense).  Proposition Nine is therefore denied.

Young, 12 P.3d at 40 (footnote omitted).

According to the Tenth Circuit Court of Appeals, Petitioner has an extremely heavy burden

in order to demonstrate entitlement to habeas relief:

> A habeas defendant challenging a state court judgment based on an erroneous
> jury instruction bears a difficult burden.  See Maes v. Thomas, 46 F.3d 979, 984 (10th
> Cir. 1995).  To prevail, [the petitioner] must establish the allegedly erroneous
> instruction rendered [his] trial fundamentally unfair.  See id.  It is not sufficient to
> show that "'the instruction is undesirable, erroneous, or even universally
> condemned.'"  Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v.
> Naughten, 414 U.S. 141, 146 (1973)).  Rather, [the petitioner] must establish the
> instruction "'so infected the entire trial that [his] resulting conviction violates due
> process.'"  Id. (quoting Naughten, 414 U.S. at 147).  Moreover, [the petitioner's]
> burden is weighted further because [his] challenge is premised on the failure to give
> an instruction rather than the rendering of an erroneous one.  See id. at 155.

Neely v. Newton, 149 F.3d 1074, 1085 (10th Cir. 1998), cert. denied, 525 U.S. 1107 (1999) (parallel

citations omitted).

> "As a general rule, errors in jury instructions in a state criminal trial are not
> reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally
> unfair as to deprive petitioner of a fair trial and to due process of law.'"  Nguyen, 131
> F.3d at 1357 (quoting Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981)); see also Maes
> v. Thomas, 46 F.3d 979, 984 (10th  Cir.) ("A state trial conviction may only be set

39

aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial."), cert. denied, 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995). Thus, the burden on a petitioner attacking a state court judgment based on a refusal to give a requested jury instruction is especially great because "'[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" Maes, 46 F.3d at 984 (quoting Henderson v. Kibbe, 431 U.S. 145, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)).

Tyler v. Nelson, 163 F.3d 1222, 1227 (10th Cir. 1999).

In Oklahoma, self-defense is justifiable homicide when a person, not at fault in bringing on the struggle, kills another under apparent necessity to save himself from death or great bodily harm. See Camron v. State, 829 P.2d 47 (Okla. Crim. App.1992); Perez v. State, 300 P. 428 (Okla. Crim. 1931); Waldon v. State, 183 P. 637 (Okla. Crim. 1919). The OCCA determined a self-defense instruction was not warranted under the facts of the case as Petitioner had entered the steak house, armed, with the intent to commit robbery. Petitioner has failed to demonstrate the failure to give a self-defense instruction rendered his trial fundamentally unfair, or that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d)(1 and 2). Accordingly, Petitioner's sixth ground for relief is denied.

Ground 7:     Religious Influence on Jury Deliberations.

In his seventh ground for relief, Petitioner claims the evidence established that one or more jurors changed their punishment stage vote from a life sentence to a death sentence because of a discussion about the Bible. Respondent responds that the OCCA's determination was reasonable and fully supported by the record, and that Petitioner has failed to rebut the presumption of correctness by clear and convincing evidence.

Petitioner first raised this claim on direct appeal. The OCCA remanded the issue to the trial

court for an evidentiary hearing on the limited issue of whether "extraneous materials, specifically a Bible or Bibles, were physically brought by one or more jurors into the jury deliberation room, and whether the same was/were referred to and utilized by jurors during the second stage deliberations." Young, 12 P.3d at 47. In its findings of facts on remand, the trial court found there was "no credible evidence that extraneous material [Bible] was brought into the jury room or used during the second stage deliberations." Id. at 48. The OCCA determined the trial court's findings of fact were supported by the record and were not clearly erroneous. Id.

On habeas review, a determination made regarding a factual issue by a state court shall be presumed to be correct and the petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Although Petitioner makes blanket assertions the evidence establishes that one or more jurors changed their decision regarding the sentence from life to death, he offers nothing to rebut the OCCA's determination. Petitioner has failed to sustain his burden of rebutting the presumption of correctness by clear and convincing evidence, or to demonstrate the requirements of 28 U.S.C. § 2254(d)(1) or (2) to be entitled to habeas relief. Accordingly, Petitioner's seventh ground for relief is denied.

Ground 8:          Victim Impact Evidence.

In his eighth ground for relief, Petitioner claims the victim impact testimony at trial focused more on emotional appeal than a description of the impact on the victim's family, turning the second stage of trial into an "emotional melodrama" contrary to clearly established federal law. Respondent responds that Petitioner's claim lacks merit because the testimony was not outside the bounds of proper victim impact testimony and did not deprive Petitioner of a fundamentally fair trial.

On appeal, the OCCA considered Petitioner's claim and determined the testimony overall

41

to be within the boundaries of proper victim impact testimony:

> As to Young's claim the narrative victim impact statement exceeded statutory and constitutional boundaries, we disagree. Title 22 O.S. Supp.1993, § 984 provides:
>
>> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.
>
> In Cargle v. State, 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, cert. denied, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996), this Court concluded that "victim impact evidence should be restricted to those unique characteristic (sic) which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family." See also Welch v. State, 1998 OK CR 54, ¶ 23, 968 P.2d 1231, 1242, cert. denied, 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).
>
> The victim impact statement given in this case was devoted to the circumstances following Joe Sutton's death and the manner in which the family dealt with that emotional impact.  While we agree that name-calling [18] was not appropriate, the victim impact statement as a whole was within the boundaries discussed in Cargle and Conover, and we do not find the evidence was more prejudicial than probative.

Young, 12 P.3d at 43-44.

The Tenth Circuit has addressed the Supreme Court's standards regarding victim impact testimony in which family members testified expressing their opinion of the crime, the defendant and the appropriate sentence.  In Hooper v. Gibson, 314 F.3d 1162 (10th Cir. 2002), a family member expressed her opinion as to the appropriate sentence for the defendant.  The Tenth Circuit stated:

> The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the

---

[18] "In part of her statement, Sutton-Dickerson said 'And I wish he hadn't been the perfect target for the bullet from a coward or heartless person with a jaded conscience.'" Young, 12 P.3d at 44 n. 20.

Eighth Amendment erects no per se bar." <u>Payne v. Tennessee</u>, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).  In so holding, the Court overruled its earlier decisions in <u>Booth v. Maryland</u>, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and <u>South Carolina v. Gathers</u>, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). <u>See</u> <u>Payne</u>, 501 U.S. at 811, 817, 830, 111 S.Ct. 2597. Nonetheless, we have recognized that "<u>Payne</u> left one significant portion of <u>Booth</u> untouched. . . . [T]he portion of <u>Booth</u> prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid.'" <u>Hain</u>, 287 F.3d at 1238-39 (quoting <u>Payne</u>, 501 U.S. at 830 n. 2, 111 S.Ct. 2597).  Therefore, the trial court erred by admitting this victim-impact testimony during Petitioner's capital sentencing proceeding. <u>See id.</u> at 1239.  Nonetheless, this constitutional error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637, 113 S.Ct. 1710 (further quotation omitted); <u>see also</u> <u>Willingham</u>, 296 F.3d at 931 (applying <u>Brecht</u>'s harmless-error analysis to similar claim).

        <u>Payne</u> also provides that victim-impact evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair" deprives a capital defendant of due process. 501 U.S. at 825, 111 S.Ct. 2597.  Because the victim-impact evidence did not have that effect here, however, the OCCA reasonably denied Petitioner relief on this due-process claim. <u>See</u> <u>Willingham</u>, 296 F.3d at 931; <u>United States v. Chanthadara</u>, 230 F.3d 1237, 1273-74 (10th Cir. 2000).

<u>Hooper</u>, 314 F.3d at 1174.

In the instant case, review of the entire record and victim impact testimony reveals the witness's statement was properly within the bounds of <u>Payne</u>.  The victim's daughter's statement addressed some of the personal characteristics of the victim, circumstances surrounding the day she was informed of his death, and the effect the victim's death had on the immediate members of his family.  As in <u>Hooper</u>, however, the statement by the victim's daughter that Petitioner was a "coward or heartless person with a jaded conscience" was outside the bounds of proper victim impact testimony.  Petitioner has not shown that the statement, even when considered in combination with the emotional nature of the other testimony, had a substantial and injurious effect or influence in determining the jury's verdict.  Substantial evidence was presented to support all three aggravating circumstances found to exist by the jury.  The victim impact testimony was not

so unduly prejudicial as to render Petitioner's trial fundamentally unfair.  Accordingly, the OCCA

reasonably denied Petitioner relief.  Petitioner's eighth ground for relief is, therefore, denied.

Ground 9:       Continuing Threat Aggravating Circumstance.

In his ninth ground for relief, Petitioner contends the "continuing threat" aggravating

circumstance is unconstitutional as applied in Oklahoma.  A close review of Petitioner's argument

reveals Petitioner is actually arguing the aggravating circumstance is vague and overbroad,

rendering it acceptable to be applied in almost every homicide.  Petitioner does not, however, argue

that the evidence was insufficient to support this aggravating circumstance, only that his sentence

is based on an invalid aggravator and based on a statutory punishment scheme that is

unconstitutional.

On appeal, the OCCA denied Petitioner's claims as to the "continuing threat" aggravating

circumstance:

> Next, Appellant claims the continuing threat aggravating circumstance is
> unconstitutional as applied in Oklahoma and contends there was not sufficient
> evidence presented to support this aggravator.  Because the State used Appellant's
> prior violent felony convictions to support the prior violent felony aggravating
> circumstance, Appellant argues the use of the underlying facts of this crime, without
> more, were insufficient to support the continuing threat aggravator.
>
> We have previously rejected claims that the continuing threat aggravator, as
> applied in Oklahoma, is unconstitutionally vague or overbroad.  See Wilson v. State,
> 1998 OK CR 73, ¶ 78, 983 P.2d 448, 466, cert. denied, 528 U.S. 904, 120 S.Ct. 244,
> 145 L.Ed.2d 205 (1999); Toles v. State, 1997 OK CR 45, ¶ 62, 947 P.2d 180, 192,
> cert. denied, 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998).  As evidence
> Appellant posed a continuing threat to society, the State argued his "current crimes"
> and his "past crimes" were both violent and Appellant's actions after the shooting
> showed a lack of remorse.  We find this evidence sufficiently shows Appellant posed
> a continuing threat to society and have previously held it is not error to use the same
> evidence to support two aggravating circumstances.  Cannon v. State, 1998 OK CR
> 28, ¶ 57, 961 P.2d 838, 852-53.
>
> Appellant also argues the use of OUJI-CR 4-74 broadens the continuing
> threat aggravator by substituting "future threat" for the required "future conduct"

element of the circumstances.  We rejected this argument in <u>Short v. State</u>, 1999 OK CR 15, ¶ 70, 980 P.2d 1081, 1103-1104, <u>cert. denied</u>, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000), and do so again.

Appellant contends the State should not be allowed to rely upon multiple counts arising from a single transaction to prove the "prior violent felony" or "continuing threat" allegations in capital sentencing.  We reject this argument for the reasons set forth in <u>Pickens</u>, 1993 OK CR 15, ¶ 38, 850 P.2d at 338.

Appellant also argues the State's reliance on the same evidence to prove "continuing threat" and "prior violent felony" was duplicative and used the same course of conduct to support the finding of separate and distinct aggravators. However, the record shows the State relied additionally upon evidence of the underlying crime to support the continuing threat aggravator.  There was no overlapping error as evidence of the underlying crime itself combined with the past violent conduct showed different aspects of Appellant's character.  <u>Turrentine</u>, 1998 OK CR 33, ¶ 82, 965 P.2d at 978-79; <u>see also</u> <u>Malone v. State</u>, 1994 OK CR 43, ¶ 39, 876 P.2d 707, 717-18 (the Court has upheld this aggravator based upon the sheer callousness of the murder).  There was sufficient evidence to prove continuing threat without evidence of prior felony convictions.

<u>Young</u>, 12 P.3d at 42.

Petitioner's challenge that the "continuing threat" aggravating circumstance is unconstitutionally vague and overbroad must be rejected in light of several cases from the Tenth Circuit Court of Appeals.  <u>See</u> <u>James v. Gibson</u>, 211 F.3d 543, 559, n. 8 (10th Cir. 2000); <u>Nguyen v. Reynolds</u>, 131 F.3d 1340, 1354 (10th Cir. 1997), <u>cert. denied</u>, 525 U.S. 852 (1998); <u>LaFevers v. Gibson</u>, 182 F.3d 705, 720 (10th Cir. 1999); <u>Ross v. Ward</u>, 165 F.3d 793, 800 (10th Cir.), <u>cert. denied</u>, <u>Ross v. Gibson</u>, 528 U.S. 887 (1999); <u>Cooks v. Ward</u>, 165 F.3d 1283, 1289 (10th Cir. 1998), <u>cert. denied</u>, 528 U.S. 834 (1999); <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1116 (10th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1025 (1999); <u>Castro v. Ward</u>, 138 F.3d 810, 816-17 (10th Cir.), <u>cert. denied</u>, <u>Castro v. Gibson</u>, 525 U.S. 971 (1998);  <u>Sellers v. Ward</u>, 135 F.3d 1333, 1339 (10th Cir.), <u>cert. denied</u>, 525 U.S. 1024 (1998).

In <u>Nguyen</u>, the Tenth Circuit found that Oklahoma's "continuing threat" aggravating circumstance was "nearly identical" to the aggravating factor used by Texas and approved by the

Supreme Court in <u>Jurek v. Texas</u>, 428 U.S. 262, 274-75 (1976).  The Tenth Circuit concluded that "the continuing threat factor used in the Oklahoma sentencing scheme does not violate the Eighth Amendment." <u>Nguyen</u>, 131 F.3d at 1354.  <u>Accord</u> <u>Ross</u>, 165 F.3d at 800; <u>Cooks</u>, 165 F.3d at 1289; <u>Moore</u>, 153 F.3d at 1116; <u>Castro</u>, 138 F.3d at 816-17; <u>Sellers</u>, 135 F.3d at 1339.  Petitioner does not make any argument which compels or permits this Court to disregard this binding precedent.  <u>See</u> <u>United States v. Foster</u>, 104 F.3d 1228, 1229 (10th Cir. 1997).

In order to support the "continuing threat" aggravating circumstance, the State must demonstrate a defendant will continue to present a threat to society after sentencing.  <u>Cudjo v. State</u>, 925 P.2d 895, 902 (Okla. Crim. App.1996).  "A defendant's criminal history, the callousness of the crime, threats against others, lack of remorse, and attempts to prevent calls to the police are all factors this Court has previously considered when addressing this issue." <u>Id.</u>[19]  The OCCA set forth testimony and evidence in the record in support of the "continuing threat" aggravating circumstance. After viewing all of the evidence in the light most favorable to the State, the testimony and evidence, together with the callous nature of the crime, is sufficient to conclude that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt.  The OCCA determination is not contrary to clearly established federal law and was reasonable under either 28 U.S.C. § 2254(d)(1) or (2).  Accordingly, Petitioner's ninth ground for relief is denied.

<u>Ground 10:</u>      <u>Victim Impact Testimony Regarding Desired Penalty</u>.

In his tenth ground for relief, Petitioner claims it was error for the trial court to not allow his trial counsel to reopen the trial after the close of the penalty phase to allow the victim's family's

---

[19]  In Oklahoma, the existence of the continuing threat aggravating circumstance may be based solely on the evidence of the calloused nature of the crime. <u>Pennington v. State</u>, 913 P.2d 1356, 1371 (Okla. Crim. App. 1995); <u>accord</u> <u>Cooks v. Ward</u>, 165 F.3d 1283, 1289 (10th Cir. 1998); <u>Snow v. State</u>, 876 P.2d 291, 298 (Okla. Crim. App. 1994).

representative to testify that she and the victim's family did not want Petitioner to receive the death penalty. (Pet. at 40-41.)

After the close of the penalty phase of trial, Petitioner's attorney moved the trial court to reopen the proceedings briefly to allow him to inquire regarding the desired penalty of the victim's family representative Tashella Dickerson.  According to counsel for Petitioner, Ms. Dickerson told Petitioner's sister in the restroom she did not want the Petitioner to receive the death penalty.  The trial court denied the motion to reopen the case, stating it was not relevant whether the victim's family wanted the death penalty or wanted Petitioner to go free. (Tr. Trans., Vol. 9, pp. 1730-34.)[20]

On appeal, the OCCA denied Petitioner's claim, stating:

> Defense counsel sought to re-open its case to recall the victim impact witness and ask her if she and her family wanted Appellant to receive the death penalty. Counsel's offer of proof reflected his belief the witness would state she understood punishment was the jury's decision but she was not asking for the death penalty as part of her victim impact statement.  The trial court denied counsel's motion to re-open, stating it was not "relevant whether they want the death penalty or they want him to go free.  I just don't think it's appropriate and it goes beyond what I think the victim impact statement should state."

> This Court has held that a victim impact witness' opinion as to the appropriateness of the death penalty is admissible, but is limited to the simple statement of the recommended sentence without amplification. Conover v. State, 1997 OK CR 6, ¶ 70, 933 P.2d 904, 913; Ledbetter, 1997 OK CR 5, ¶ 31, 933 P.2d at 891.  Conversely, we must also hold that a victim impact witness' opinion the defendant should not get the death penalty would also be admissible.  To that extent, the trial court's refusal to allow the testimony was error.

> However, the decision to permit either party to re-open its case for the purpose of introducing further evidence is within the trial court's discretion. Guy v. State, 1989 OK CR 35, ¶ 19, 778 P.2d 470, 475; Jones v. State, 1969 OK CR 138, ¶ 4, 453 P.2d 319, 320. Defense counsel moved for a mistrial after the victim impact evidence was given, and when that motion was denied, counsel passed the witness

---

[20]   Earlier, during and after the testimony of Tashella Dickerson, Petitioner's counsel objected to the victim's impact statement and moved for a mistrial on the grounds the statement was outside the guidelines of the OCCA, self-serving and a repetitious plea for the death penalty. (Tr. Trans, Vol. 9, pp. 1679-80, 1682-83.)

without asking any questions.  Counsel gave up the opportunity to ask the witness what penalty she and Young's family thought was appropriate when he passed the witness and thereafter rested the case.  While we believe the witness' opinion was relevant and would have been admissible, under these circumstances we cannot say the trial court abused its discretion in denying the motion to re-open.

Young, 12 P.3d at 43.

As noted previously, it would have been improper for the trial court to have allowed the victim's family representative to testify during the penalty phase of trial regarding her opinion of the appropriate sentence.  In Hooper v. Mullin, 314 F.3d 1162 (10th Cir. 2002), the Tenth Circuit stated:

The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).  In so holding, the Court overruled its earlier decisions in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). See Payne, 501 U.S. at 811, 817, 830, 111 S.Ct. 2597. Nonetheless, we have recognized that "Payne left one significant portion of Booth untouched. . . . [T]he portion of Booth prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in Payne and remains valid.'" Hain, 287 F.3d at 1238-39 (quoting Payne, 501 U.S. at 830 n. 2, 111 S.Ct. 2597).

Id. at 1174.

Petitioner also argues it was error for the trial court to refuse to reopen the case.  "Reopening a case for additional evidence is within the discretion of the trial court." City of Wichita, Kansas v. United States Gypsum Co., 72 F.3d 1491, 1496 (10th Cir. 1996).  In Petitioner's trial, the trial court ruled the evidence was not relevant and refused to reopen the case.  "'State court rulings on the admissibility of evidence may not be questioned in federal habeas corpus proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights.'" Chavez v. Kerby, 848 F.2d 1101, 1102 (10th Cir. 1988) (quoting Brinlee v. Crisp, 608 F.2d 839, 850

(10th Cir. 1979), cert. denied, 444 U.S. 1047 (1980)).

Petitioner has failed to demonstrate the trial court's refusal to reopen the case and to allow the victim's family's representative to testify regarding her opinion of the appropriate sentence rendered his trial so fundamentally unfair as to constitute a denial of his federal constitutional rights. Petitioner has also not demonstrated that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner's tenth ground for relief is denied.

**D.    Conclusion.**

After a complete review of the transcripts, trial record, appellate record, record on post-conviction, briefs filed by Petitioner and Respondent, the evidentiary hearing and the applicable law, the Court finds Petitioner's request for relief in his *Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus by a Person in State Custody* (Docket No. 18) to be without merit. ACCORDINGLY, habeas relief on all grounds is **DENIED**.

IT IS SO ORDERED this 29th day of July, 2005.

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE